**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| HEALTH AGENTS FOR AMERICA,<br>*Plaintiff*,<br>vs.<br>ROBERT F. KENNEDY, JR., et al.,<br>*Defendants*. | Case No.______________ |

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Health Agents for America ("HAFA"), by and through undersigned counsel, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 65 for entry of a temporary restraining order and a preliminary injunction: (1) enjoining Defendants from implementing or enforcing the moratorium on new agent and broker registrations for Plan Year 2027 as set forth in 45 C.F.R. § 155.220(o) and, *see* 91 Fed. Reg. 60317 (Sept. 23, 2026); and (2) compelling Defendants to conduct agent and broker training for new agents and brokers who otherwise meet state licensing requirements and to register such agents who successfully complete the CMS training program so they may participate in open enrollment when it begins on November 1, 2026.

As explained in the accompanying Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiff is likely to succeed on the merits of its claims under the Administrative Procedure Act, 5 U.S.C. §§ 553, 706; HAFA's members face irreparable harm without preliminary relief; the balance of equities weighs

decidedly in Plaintiff's favor; and an injunction serves the public interest. Without a temporary restraining order and preliminary injunction, HAFA's members will be excluded from the Plan Year 2027 open enrollment period and incur unrecoverable losses.

Plaintiff submits a supporting Memorandum, declarations, and proposed order herewith and respectfully requests a hearing on this Motion at the Court's earliest convenience.

Plaintiff also asks the Court to waive security under Federal Rule of Civil Procedure 65(c) or, alternatively, require only nominal security.

For these reasons and those stated in the accompanying Memorandum, this Motion should be granted.

Dated: October 21, 2026

Respectfully submitted,

*/s/James R. Napoli. Esq.*

JAMES R. NAPOLI, ESQ. (BAR No 16766)
Diceros Law PLLC
1054 31st Street, Suite 300
Washington, DC 20007
Phone: (202) 705-3973
jrnapoli@diceros.law

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

HEALTH AGENTS FOR AMERICA,

*Plaintiff*,

vs.

ROBERT F. KENNEDY, JR., et al.,

*Defendants*.

Case No.______________

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

Insurance agents and brokers play an important role in helping individuals and families obtain health insurance coverage through the Health Insurance Marketplace (the "Marketplace") established under the Affordable Care Act (ACA). Their responsibilities include educating consumers about available health plans, assisting with plan comparisons, facilitating enrollment, and explaining eligibility for financial assistance. Agents and brokers serve as intermediaries between consumers and insurance companies, helping consumers understand their coverage options and make informed decisions based on their health care needs and financial circumstances.

Under the ACA, agents and brokers may assist consumers with applying for and enrolling in qualified health plans through the federal or state-based Marketplaces. They can explain plan features, including premiums, deductibles, copayments, provider networks, prescription drug

coverage, and out-of-pocket maximums. They may also help consumers understand eligibility for advance premium tax credits and cost-sharing reductions, which can lower the cost of qualifying Marketplace coverage. Eligibility for these forms of assistance is determined under applicable federal requirements and Marketplace procedures, rather than by the agent or broker.

Agents and brokers who assist with Marketplace enrollment must comply with applicable federal and state requirements. These responsibilities include maintaining appropriate state insurance licensure, completing Marketplace training, and registering with the Centers for Medicare & Medicaid Services ("CMS"). However, on September 23, 2026, the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") issued and interim final rule that closed Marketplace training and registration for "new" agents and brokers, which is defined under the interim final rule as an agent or broker who was not registered with CMS and, therefore, did not hold an Exchange Agreement with CMS for Plan Year 2026. *See* CMS-9872-IFC and published at 91 Fed. Reg. 60317 (Sept. 23, 2026) (promulgating 45 C.F.R. § 155.220(o)) ("the Rule").

Through the Rule, CMS thrust this moratorium upon new agents and brokers without advance notice, without any opportunity to comment on the moratorium, and without any exception, whether hardship or otherwise. CMS chose to implement the moratorium a little over a month before the Plan Year 2027 open enrollment period opens on November 1, 2026. Prior to issuance of the Rule, HAFA members had already hired, trained and put on payroll, agents and brokers who are fully licensed and otherwise fully qualified to assist with ACA applications and enrollments. The Rule renders the investment in those hires a loss. Moreover,

## STATEMENT OF FACTS

### A. The Role of Agents, Brokers, and Agencies under the ACA

In order for an agent or broker to sell health insurance policies on a Federally-facilitated Exchange ( "FFE" or "Marketplace"), the agent or broker must complete Marketplace training, register with CMS, and enter into an agreement with CMS ("Exchange Agreement") for the plan year within which health insurance policies will be issued through an FFE.

Agents and brokers who held a Plan Year 2026 Exchange Agreement enrolled approximately seventy-six percent (76%) of all enrollments made through Healthcare.gov for that plan year.[1] This is an approximately forty-six percent (46%) increase in agent or broker assisted enrollments when compared to Plan Year 2023 enrollments. *Id*.

CMS's statistics highlight the important role agents and brokers play in enrolling and assisting consumers navigate the health insurance Marketplace. Indeed, CMS actively recruits agents and brokers to sell ACA policies on the promise that through the Marketplace an agent or broker can "help your [their] clients save money – and collect full commissions"; "get new clients"; "provide any level of service, collect the full commission"; and "handle everything online". [2]

Independent agents and brokers are the "boots on the ground" personnel who locate and service consumers who would otherwise be looked over and who, while eligible for health coverage through an FFE, would not be able to enroll in such coverage but for the assistance of the agent or broker. That is to say, that agents and brokers often interact directly and in-person

[1] See *Health Insurance Exchanges 2026 Open Enrollment Report*, https://www.cms.gov/files/document/health-insurance-exchanges-2026-open-enrollment-report.pdf (last visited Oct. 20, 2026).

[2] See, e.g., https://www.healthcare.gov/agents-and-brokers-register/ (last visited Oct. 20, 2026).

with consumers despite CMS's comment that an agent or broker can "handle everything online". See Exhibit C, *Affidavit of Health Agents for America* (October 19, 2026).

Insurance agencies rely on qualified personnel to serve existing clients, respond to new inquiries, handle seasonal enrollment demand, and maintain continuity of service. *Id*. *See also*, Exhibit D, *Affidavit of HAFA Member Johnny Wallin* (October 19, 2026). Recruiting and onboarding new agents is an important means of replacing personnel who leave, expanding consumer service capacity, and meeting increased demand during enrollment periods. *Id*. Insurance agencies incur costs associated with recruitment, licensing, training, compliance, supervision, technology, and staffing. Restrictions that delay entry into the relevant Exchange registration system can impair the value of those investments and disrupt planned staffing arrangements. *Id*.

Significantly, Consumers for whom English is their second language, whether a legal immigrant or a U.S.A. born citizen, are a group that often requires direct interaction and in-person assistance. *Id*. As such, insurance agencies must hire agents and brokers who are fluent in languages other than English. *Id*.

### B. The Challenged Rule

HHS and CMS published CMS-9872-IFC at 91 Fed. Reg. 60317 *et seq*. The Rule adds 45 C.F.R. § 155.220(o), establishing a framework under which HHS may impose temporary moratoria on specified agent and broker registrations with the FFEs.

On September 23, 2026, the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") issued CMS-9872-IFC and published at 91 Fed. Reg. 60317 (Sept. 23, 2026) (promulgating 45 C.F.R. § 155.220(o)) ("the Rule"). The Rule establishes a framework for temporary moratoria on certain agent and

broker registrations with the Federally-facilitated Exchanges and immediately, without prior notice, imposed a moratorium affecting agents and brokers who did not have Plan Year 2026 Exchange agreements and seek to register for Plan Year 2027. *Id.* at 60320-22.

The moratorium took effect September 22, 2026 and lasts until February 1, 2027, meaning any agent or broker who did not have a Plan Year 2026 Exchange agreement with CMS will not be given such an agreement for Plan Year 2027. CMS estimates that the current moratorium will sideline approximately 19,000 "new"[3] agents and brokers from assisting consumers in purchasing health insurance coverage through the Federally-facilitated Exchanges.

The Rule threatens substantial operational and economic harm to HAFA members by restricting the ability of affected agencies to recruit, onboard, and deploy new agents and brokers during a critical enrollment period. The resulting personnel constraints will impair these agencies' capacity to respond to consumer inquiries, provide enrollment assistance, maintain service levels, replace departing personnel, and expand capacity to serve new clients.

The consequences extend beyond the businesses themselves. Consumers who rely on licensed agents and brokers for assistance understanding coverage options, navigating enrollment requirements, and maintaining appropriate health insurance coverage may experience delays, reduced access to assistance, or difficulty obtaining individualized service. The adverse impact the Rule will have on consumers and the overall stability of the ACA Marketplace cannot be

[3] For purposes of the Rule, a "new" agent is an agent or broker who did not have a Plan Year 2026 Exchange agreement with CMS. That is to say, the CMS definition of a "new" agent or broker does not take into account the number of years an agent or broker has been licensed to sell health insurance nor does it take into account whether the agent or broker held an exchange agreement for years prior to Plan Year 2026 open enrollment (*i.e.*, the Rule does not consider the years of experience that the agent or broker has selling on the Federally-facilitated Exchanges prior to the Plan Year 2026 but, rather, draws an arbitrary line at whether or not said agent or broker held a Plan Year 2026 agreement with CMS).

understated inasmuch as seventy-six percent (76%) of all active plan selections made on Healthcare.gov for plan year 2026 were agent/broker assisted.[4]

Notably, there is no exception in the Rule that would permit an agent who did not hold a Plan Year 2026 Exchange Agreement to contract with CMS for the 2027 Plan Year. Thus, for example, an agent who has held an Exchange Agreement for years prior to Plan Year 2026, but who did not contract with CMS for the 2026 Plan Year (*e.g.*, had a health issue in 2026, took a sabbatical in 2026, or for any number of reasons did not hold a 2026 Exchange Agreement) is precluded from selling ACA policies on the Marketplace for the Plan Year 2027 open enrollment period under the Rule. Like HAFA, the NAIC sees a significant issue in the absence of any exceptions to the moratorium issued under the Rule. *See* Exhibit A, *NAIC Letter to Director Nelson* (Oct. 14, 2026).

**C. CMS's Asserted Good-Cause Rationale**

33. CMS invokes concerns about an ongoing pattern of unauthorized enrollment, unauthorized plan switching, and other fraudulent or noncompliant conduct by a subset of agents and brokers. 91 Fed. Reg. 60317, 60321-22 (Sept. 23, 20226).

34. CMS cites, among other matters, its cancellation on August 31, 2026, of approximately 315,000 Plan Year 2026 policies covering more than 760,000 individuals whose enrollments allegedly lacked verified citizenship or immigration documentation and for whom issuers were unable to identify claims or establish consumer contact. *Id*. at 60323.

35. CMS also states that it terminated Exchange agreements for hundreds of noncompliant agents and brokers beginning in January 2026 and that newly registered agents and

---

[4] See *Health Insurance Exchanges 2026 Open Enrollment Report*, https://www.cms.gov/files/document/health-insurance-exchanges-2026-open-enrollment-report.pdf (last visited Oct. 20, 2026).

brokers were disproportionately represented among those subject to enforcement actions. *Id*. at 60325.

36. CMS contends that existing safeguards do not adequately address vulnerabilities associated with agent and broker access to federal Exchange systems, enrollment functions, and consumer information. It asserts that a temporary pause will allow it to implement enhanced identity-verification, authentication, monitoring, and other program-integrity controls. *Id*. at 60322.

37. CMS further relies on the approaching November 1, 2026, start of Plan Year 2027 Open Enrollment. It asserts that completing notice-and-comment rulemaking before implementing the moratorium would leave time for additional agents and brokers to register before the restriction became effective. *Id*.

38. Finally, CMS asserts that advance notice could encourage prospective registrants to accelerate their registrations before the moratorium took effect, thereby undermining the Agency's objective. *Id*. at 60325.

39. Plaintiff does not ask the Court to disregard legitimate efforts to prevent fraud, protect consumers, or maintain the integrity of federal Exchange systems. The question presented is whether CMS satisfied the specific procedural requirements Congress imposed before adopting the challenged rule.

## ARGUMENT

### I. HAFA Is Likely to Succeed on the Merits

#### a. HHS Promulgated Section 155.220(o) Without Notice and Comment and HHS Failed Adequately To Establish Good Cause For Dispensing With Prior Notice And Comment

HHS relies on the "good cause" exception to the notice and comment requirements of the APA. *See* 91 Fed. Reg. at 60323-25. Under the APA, an agency may implement a new rule

absent notice and comment if the agency for good cause finds that following the APA's notice and comment procedure would be impracticable, unnecessary, or contrary to the public interest. 5 U.S. Code § 553(b), see also, U.S. Code § 553(d)(3) (good cause waiver of 30-day notice period). HHS argues that it is both impracticable and not within the public interest for it to follow the APA notice and comment process in regard to the implementation of the Rule and, as such, HHS has good reason to waive the notice and comment process. *Id*. HHS's argument is unavailing.

The good cause exception is narrowly applied by the courts and the circumstances upon which the exception would be permitted are rare. *N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 767 (4th Cir. 2012). Under the "impracticable" prong of the good reason exception, an agency must demonstrate that following the APA's notice and comment process would interfere with the agency's functions during the pendency of said process. *Id*. citing, *Nat'l Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377, 384-85 (2d Cir. 1978) (Friendly, J.) (quoting S. Rep. No. 752, at 200 (1945)). Simply stated, the good cause exception is reserved to emergency situations or situations where delay could cause serious harm. *Jifry v. FAA*, 370 F.3d 1174, 1179, 361 U.S. App. D.C. 450 (D.C. Cir. 2004); see also Natural Res. Def. Council, Inc. v. Evans, 316 F.3d 904, 911 (9th Cir. 2003) ("notice and comment procedures should be waived only when delay would do real harm."); *Util. Solid Waste Activities Group*, 236 F.3d at 754 (good cause exception "should be limited to emergency situations"). Examples of such situations include rulemaking needed to address the imminent threat of harm to aircraft, persons, and property in the United States; to provide life-saving measures for mine workers; or where necessary to avoid an imminent threat to the environment or national security. *Id*. citing *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93, 401 U.S. App. D.C. 194 (D.C. Cir. 2012).

HHS fails to demonstrate that there is an imminent threat of harm to body or national security of such a nature that bypassing the APA's notice and comment process is appropriate.

HHS and CMS have been whistling past the graveyard in their handling of fraud in the Marketplace for at least a decade. *See* Exhibit E to Plaintiffs Complaint, GAO Report *Patient Protection and Affordable Care Act: Preliminary Results from Ongoing Review Suggest Fraud Risks in the Advance Premium Tax Credit Persist* (Dec. 5, 2025). As such, it is disingenuous at best for HHS to claim that there is an "emergency" of the nature that would trigger the good cause exception to the notice and comment process under the APA. Moreover, HHS admits that it has other statutory and regulatory means to rein in fraud and abuse and that it has been successful in its effort to curb fraud and abuse in the Marketplace. *See* 91 Fed. Reg. at 60319, 60325.

HHS also argues that it need not follow the APA's notice and comment process because it is in the public's interest to forgo said process. *See* 91 Fed. Reg. at 60326. HHS argues that providing notice prior to implementing the current moratorium could have enabled "bad actors" to take advantage of the time between the notice and the implementation of the Rule to be credentialed to sell on the Marketplace and subsequently to "flood the Federally-facilitated Exchanges with improper, incomplete or unauthorized enrollment applications in an attempt to collect commission payments, and benefit from the delay sin CMS' post-hoc enforcement efforts," which would not be in the public interest. *Id*.

Like the impracticability prong of the good cause exception, the public interest prong is invoked "only in the rare circumstances when ordinary procedures — generally presumed to serve the public interest — would in fact harm that interest." *Mack Trucks*, 682 F.3d at 95. This is not one of those rare circumstances.

Contrary to CMS' contention, the harm to the public in not having enough duly licensed, trained, and certified agents and brokers to assist consumers in obtaining health insurance coverage through the Marketplace outweighs the hypothetical "flood" of improper applications that could be submitted to FFEs by "bad actors". *See* Exhibit A to Plaintiff's Complaint, *NAIC Letter to Director Nelson* (Oct. 14, 2026). Stated another way, constructing a hypothetical "boogey-agent" that hypothetically could create mischief in the Marketplace does not outweigh the public's interest in having enough licensed and credentialed agents and brokers to assist consumers in achieving Congress' primary goal in passing the ACA; namely, getting consumers covered under a health insurance policy. *Id*., *see also* Exhibit C to Plaintiff's Complaint, *Affidavit of Health Agents for America* (October 19, 2026).

CMS imposed the moratorium approximately one month before open enrollment commences for Plan Year 2027. The disruption that the moratorium has already caused agencies and the consumers that the agencies service is real and certainly is not within the public interest. *Id*., *see also*, Exhibit D to Plaintiff's Complaint, *Affidavit of HAFA Member Johnny Wallin* (October 19, 2026). Indeed, the public interest is limited in regard to fraud when measured against the public's ability to obtain health insurance coverage through the Marketplace.

HHS failed to follow the notice and consent requirements under the APA in regard to its promulgation of Section 155.220(o) through issuance of the CMS-9872-IFC. Moreover, HHS has failed to demonstrate that it had reasonable cause to waive the notice and consent requirements under the APA. The Court should therefore set aside the Section 155.220(o) pursuant to 5 U.S.C. § 706(2)(D). Because CMS derived its authority to issue the current moratorium under Section 155.220(o), the moratorium should likewise be vacated by the Court.

**B. HHS overstepped its authority granted under the Affordable Care Act in adopting the Interim Final Rule**

HHS overstepped its statutory authority in promulgating Section 155.220(o). Section 155.220(o) permits CMS to adopt moratoriums whenever:

> HHS determines that agent and broker conduct poses an unacceptable risk to the accuracy of the Exchange's eligibility determinations, Exchange operations, applicants, enrollees, or Exchange information technology systems, including risk related to noncompliance with the standards of conduct…….

See, Section 155.220(o) at 91 Fed. Reg. at 60334. Setting aside that the Rule does contain any standard pursuant to which HHS makes such a determination, HHS reliance on the stated provisions of the ACA as granting HHS the ability to adopt the rule in the first instance is unavailing.

HHS first cites ACA Section 1312(e) as the basis for its authority promulgate Section 155.220(o). Section 1312(e) of the ACA permits HHS to establish procedures under which a State may allow agents or brokers to sell on a state exchange. 42 U.S. Code § 18032(e). However, Section 155.220(o) sets forth a procedure aimed at the Federally-facilitated Exchanges and FFEs are not state exchanges. As such, Section 1312(e) of the ACA does not apply in regard to HHS's ability to adopt procedures governing agents and brokers who sell through an FFE. Moreover, setting the issue previously raised, Section 1312(e) of the ACA is written in the positive, meaning it permits HHS to establish procedures that permit or allow agents and brokers to sell on an exchange. *Id*. The rule does not provide HHS with the authority to issue a moratorium that effectively blocks a group of agents and brokers from selling on an exchange, particularly when there are no standards to which HHS is held in making such determinations.

*Id*.

HHS next cites Sections ACA Section 1321 as a source of its authority to promulgate Section 155.220(o). 91 Fed. Reg. at 60318. However, ACA Section 1321does not address agents and brokers or otherwise provide HHS with the authority to issue moratoriums on agent and broker certifications. 42 U.S. Code § 18041. As such, HHS's reliance on Section 1331 of the ACA is without merit.

Finally, HHS cited ACA Section 1313(a)(5)(A) as yet another purported source of authority to promulgate Section 155.220(o). 91 Fed. Reg. at 60318. That Section states in pertinent part that:

> With respect to activities carried out under this title, the Secretary shall provide for the efficient and non-discriminatory administration of Exchange activities and implement any measure or procedure that —
>
> (A) the Secretary determines is appropriate to reduce fraud and abuse in the administration of this title; and
>
> (B) the Secretary has authority to implement under this title or any other Act.

42 U.S.C. § 18033(a)(5). Significantly, ACA Section 1313(a)(5) requires that HHS has authority under another statutory provision in order for HHS to adopt procedures aimed and curbing fraud and abuse. *Id*. As indicated above, the two statutory provisions HHS relies on for its purported authority to promulgate the Section 155.220(o); namely, ACA Sections 1312(e) and 1321, do not provide HHS with any authority to issue a moratorium or otherwise promulgate Section 1313(a)(5).

## II. Plaintiff Will Suffer Irreparable Harm in the Absence of Relief

HAFA members are already suffering and will continue to are likely to suffer harm that is "actual and imminent," and "irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197,216 (4th Cir. 2019). Moreover, the APA does not authorize money damages, meaning HAFA members' economic harms are unrecoverable under the APA. *See Nat'l Mining Ass'n v. Jackson*, 768 F.Supp. 2d 34, 52 (D.D.C. 2011); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020). As such, the members' losses are irreparable. *See Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, 770 F. Supp. 3d 822, 858 (D. Md. 2025); *see also Mountain Valley Pipeline*, 915 F.3d at 218 ("In the unusual circumstances presented here, in which monetary damages will be unavailable to remedy financial losses when litigation ends, there is no bar to treating those losses as irreparable injury justifying preliminary relief.").

CMS-9872-IFC has resulted in new agents that HAFA members have hired, trained and put on payroll, and who are fully licensed and otherwise fully qualified to assist with ACA applications and enrollments, now being unable to assist with ACA applications and enrollments for plan year 2027 open enrollment because they cannot enter into an Exchange Agreement with CMS. *See* Exhibit C to Plaintiff's Complaint, *Affidavit of Health Agents for America* (October 19, 2026); *see also* Exhibit D to Plaintiff's Complaint, *Affidavit of HAFA Member Johnny Wallin* (October 19, 2026).

**Specific injuries to HAFA members include**:

CMS-9872-IFC will result in HAFA members needing to lay off new hires, who have already been invested in, who are licensed and otherwise fully qualified, and who were hired to

assist ACA consumers, but who now cannot assist consumers with their ACA applications and enrollments as a result of CMS-9872-IFC. *Id*.

CMS-9872-IFC will result in significant financial harm to HAFA members because it would eliminate the value of the investments that HAFA members have made in hiring, training, and adding to payroll new agents to assist with ACA plan year 2027 open enrollment. *Id*.

CMS-9872-IFC restricts the available pool of qualified, licensed agents HAFA members may hire to assist their consumer clients and prospective consumer clients. *Id*.

CMS-9872-IFC will disrupt HAFA Members' ability to assist their current consumer clients, let alone any new consumer clients, for ACA plan year 2027 open enrollment. *Id*.

CMS-9872-IFC will disrupt HAFA Members' ability to assist their current and prospective consumer clients will result in significant harm due to increased client churn and the inability for HAFA Members to acquire and retain new clients because of agent staffing shortages, as well as irreparable harm to HAFA members' reputation and standing amongst their clients and the communities they serve. *Id*.

CMS-9872-IFC disrupting HAFA members' ability to assist current and prospective consumer clients will result in consumers having less access to licensed, qualified agents who may assist them in navigating the complexities of applying for and enrolling in Marketplace coverage, receiving the best Marketplace coverage available to them, or applying for and enrolling in marketplace coverage at all. *Id*.

These injuries are directly attributable to the challenged Rule and moratorium and would be materially alleviated by an order preventing their implementation or enforcement pending compliance with the APA.

The injuries are particularly time-sensitive because the Plan Year 2027 Open Enrollment Period begins November 1, 2026. Once affected enrollment opportunities pass, HAFA members may be unable to recover those opportunities through a later award of monetary relief.

**CONCLUSION**

The Court should grant this motion and order CMS to lift the moratorium and immediately start new agent and broker training so HAFA's members and their employees can register in time for open enrollment on November 1, 2026, or, otherwise no later than December 2026, so that these agents and brokers may participate in Open Enrollment 2027.

Dated: October 21, 2026

Respectfully submitted,

*/s/James R. Napoli. Esq.*
JAMES R. NAPOLI, ESQ. (BAR No 16766)
Diceros Law PLLC
1054 31st Street, Suite 300
Washington, DC 20007
Phone: (202) 705-3973
jrnapoli@diceros.law
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of October, 2026, I served a copy of the foregoing Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunctive Relief via certified mail to:

Dr. Mehmet Oz
The Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Robert F. Kennedy, Jr.
United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

Todd Blanche
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Tel.: (202) 514-2000

Counsel for Defendants

Kelly O. Hayes
United States Attorney for the District of Maryland
U.S. Attorney's Office, District of Maryland
36 S. Charles Street 4th Fl.
Baltimore, MD 21201
Tel.: (410) 209-4800

Counsel for Defendants

*/s/James R. Napoli. Esq.*
JAMES R. NAPOLI, ESQ.

*Counsel for Plaintiff*